Case numbers 143771 and 143772, United States v. Jessica Hunt and Jordi Callahan, oral argument not to exceed 20 minutes per side, Mr. Bryant for the appellant. Good morning, Your Honor. Good morning. I'd like to preserve five minutes for rebuttal, please. All right. Morning, Your Honors. My name is Edward Bryant. I'm an Assistant Federal Public Defender for the Northern District of Ohio. And it's my pleasure today to be here on behalf of Appellant Jessica Hunt. I've also been a lot of the time a co-defendant in this case, Jordi Callahan, upon his attorney's request, Mr. Don Butler. In essence, the issues for both defendants are primarily the same. I believe that Mr. Butler raised a couple other issues in his brief in addition to the ones that were raised in ours. But primarily this morning I'm going to focus on three issues, the first issue being the sufficiency of the evidence as it related to the forced labor conviction in this case. The second, if I have time, I'd like to transition into the failure to allow the defendants to fully confront Daniel Brown, one of the cooperating witnesses in this case, with the full benefit of the bargain that he received in return for his cooperation with the government. And I think it's important to touch upon an important sentencing issue in this case, which is the kidnapping enhancement that was in essence instructed to the jury without the requirement that that be proven beyond a reasonable doubt. All three issues, of course, are important. We believe all the issues in our brief are important, but back to the sufficiency argument. This case, I believe, is different than a lot of cases as it relates to sufficiency, and it's because of the nature of the statute itself. This is a statute that this court has already found was not applicable to certain facts in a similar case brought, called the United States v. Tove Avi. And Tove Avi then was relying upon the Supreme Court's decision in Bond in the chemical weapons case. And both of these cases, I think, stand for the premise that there can be overreach from the plain reading of a federal statute. And when this occurs, there's a danger that there can be an encroachment onto traditional local police powers. How old was the victim in the Tove Avi case? The Tove Avi case, they were children victims. They were people who were young children that Tove Avi accepted to, said he was going to educate them, and then he brought them into his home. But wasn't the, I mean, I was on the panel. Wasn't one of the difficulties there that you had this in parentis situation where they were supposed to be helping as children would help if they were their real children? And so a lot of the work related to that and a lot of the discipline related to things like school work. Whereas this case, we have a disabled adult, right? Well, there is a difference in the facts, obviously, in the sense that Tove Avi was dealing with the, as you stated, the in-local parentis issue. I don't believe that that still, for example, in Jumeci, which Your Honor authored, that also was a child that was brought from not a relative or someone related to the defendant in that case from Cameroon. That person was 14 years old. Your Honor, I believe, remarked that as compared to an au pair situation gone awry, this went well beyond that, including the fact that that young woman was sexually assaulted by the defendant and so on and so forth. So you still have the contrasting there, meaning that children can still be engaged in forced labor. It wasn't just the facts of the case that Tove Avi was acting in local parentis that saved Tove Avi from being convicted. Well, in this case, what part of it's, how can you say there's not labor and how can you say it wasn't forced? Okay. Well, I can say that there, well, obviously there's labor in the sense that there's household chores being done, cleaning the kitchen, sweeping the floor, in this 200-square-foot apartment, taking the dogs out, cleaning up after the dogs, things that there was evidence to believe that my client also was responsible for and that she also engaged in as well, including making the family meal every night, going to the grocery store not only for her family but for the complaining witness in this case as well, and taking their food stamp allotment and keeping them separate and purchasing food for her children as she helped purchase the food for the disabled person in this instance as well. So you do obviously have work around the house, as we all do, and a shared living experience as roommates. Except that it wasn't shared in this case, right? Well, that's what the allegation was. I mean, but the evidence is such that if you're looking at the totality of the evidence, even viewing it in light most favorable to the government, there was significant evidence of shared responsibilities. For example, when they were out scraping the house to try to get a subsidy by improving the home, making it maybe Section 8 accessible, there's evidence that Ms. Hunt was out there scraping the house along with Shannon Eckley. These are roommates that were both going to engage in scraping the house. That sounds like a fairly benign rendition of the evidence, because here there was force, there was violence, there was isolation in terms of living conditions, threat of legal process, terrible living conditions, and psychological suppression, and all those things really are quite different from the picture you paint. That's certainly the government's narrative, but the facts that I'm articulating at this juncture are encompassed in this huge record. This was a very lengthy trial. This was a period of over 800 days that these individuals lived together. But all that conflicting evidence was before the fact finder to determine. And just to say, so you can't really say there was insufficient evidence. It depends upon what version of the evidence was believed by the fact finder. Well, it's always the mystery of what version of the evidence was believed by the fact finder. The government also alleged that our clients engaged in the theft of this individual's government benefits. The jury acquitted them of those counts. They also alleged that Mr. Callahan sexually assaulted Shannon Eckley. The jury did not make that special verdict finding as it related to Mr. Callahan's sentencing. The government also alleged that Callahan and Hunt engaged in witness tampering, and the jury also found that they were acquitted of that, found that they were not guilty of that. Sounds like a reasonable jury. It does sound like a reasonable jury. I think the problem comes in the facts that when it comes down to the end of the case, when you get to the instructions in the forced labor allegation, the judge basically tells them, here's all the overt acts, and you only need to find one of them. And so you have a jury that's looking at an admittedly terrible set of facts, even the ones that we don't dispute. Shannon Eckley was beaten by D.J. Brown, and he did forcibly shave her head into a mohawk, and he did right on her face. But then the issue is... Did he smash her hand with a hammer or some other... Well, that was the other cooperating witness, Desiree Sillsby, smashed Shannon Eckley's hand in a door frame and then smashed it again with a rock, so that that relates to the other count of conviction that I'm not addressing this morning, which is the deception to obtain dangerous drugs. There's no doubt that a lot of very harsh things happened against this individual in this case. The question is whether there's truly a nexus between that traditional bad stuff that state courts deal with and the labor itself, or does it strain credibility to believe that they beat her up because they found a map that led to a boy that Daniel Brown became jealous of, and so he beat Shannon Eckley. In fact, the evidence revealed that Shannon Eckley admitted that Jordy Callahan literally pulled Daniel Brown off of her when he was attacking her. Of course, the government's narrative is that that showed a note of an escape plan and that Shannon was trying to escape. The other distinction between the facts of this case and the facts of just about every other forced labor case is the fact that when you look at most forced labor cases, you're talking about individuals who come here under suspicious immigration circumstances who are basically prisoners in the home in and of itself. The idea being they're particularly vulnerable? They're particularly vulnerable. What about disabled people? Well, disabled people are particularly vulnerable if they're isolated, but the evidence in this case was overwhelming that Shannon Eckley was not. In fact, locked in a room upstairs with her child and Daniel Brown talked about screwing down the windows so she couldn't get out. And that will transition me to the second issue that I want to address because if there is a Rule 29 problem, it's when you look at, okay, now we're going to view the evidence in the light most favorable to government and we're going to accept everything that Daniel Brown says is truth and so now we have a situation here where you have corroboration that she's being restrained. Of course, Jessica Hunt said none of those facts ever happened, but facts that did happen that are not in dispute. Shannon Brown, during this period of time, was in contact with law enforcement on three separate occasions, even during a period of time where she supposedly was being held captive in the basement because she was arrested for shoplifting. She sat in a jail cell while her daughter was supposedly being held in a cold basement and never revealed to law enforcement that she was in fact, that her daughter was trapped. Yeah, but she was mentally disabled to some extent. Well, she was mentally disabled. She graduated from... She had been brainwashed by these captors. That's a fanciful narrative that the government did attempt to weave during this trial. I'm not sure that the jury made its finding upon that. I think they clung to one of those overt acts in this overly broad statute that says, well, if there's force and there's labor and there's a connection at all between the two, then, therefore, we can find someone guilty of forced labor. And that's the problem when you're talking about overly broad statutes being applied to myriad circumstances. Well, you're not claiming that the victim was paid for, provided wages, anything like that, for all the labor she was forced to provide. Not in the least. She was a roommate living in an apartment, and these were shared responsibilities, that they would cook and clean. In fact, she never cooked. That sounds awfully benign, but I thought there was evidence that they didn't even provide her with bathroom facilities. They had to, was forced to utilize the room or the area where they lived or slept. And, again, those are facts. Or their bodily functions. I mean, it's just a terrible set of facts if all that was true, and I guess ordinarily we'd leave it to the fact finder to sift through all of that. And I agree that there are terrible sets of facts, and I also ask your honors to look at this in a common sense way and also look at the entire record. Because when you look at the entire record, you not only show this person making contact with law enforcement officers on several occasions, including occasions where they came and interviewed her in the home, and she sat out in the vehicle with law enforcement officers and never said, I'm being held captive against my will. Why is that such a big deal for somebody who's disabled and doesn't really know her rights? Well, I think that's sort of offensive to Shannon Eckley herself. She's a high school graduate. She was working at Ashland University. She has the ability to read and write. In fact, she testified that one of her favorite pastimes is reading mystery novels. Other people testified that when they came to the home she was frequently seen reading a book. Other people testified that she partied with the others and was out in the cookouts and got high and did drugs with them, which was consistent with the manner in which they lived in a previous residence that was the White's residence in this instance. This is a woman with traumatic brain injury following an automobile accident, right? Yes. Now, the government didn't present any expert witness, any psychologist or neurologist or psychiatrist to say what the level of Shannon Eckley's disability was, whether or not she had the ability to think and fend for herself at all. They didn't present that. They wanted to present it just basically based upon the same speculation that we're engaging in here. Well, she was disabled. Of course she didn't have the ability to help herself. She went to psychologists at the Social Security Administration, was interviewed by a psychologist where she said that Jessica Hunt was her friend. This is all evidence in the record. Jessica Hunt was her friend, that she enjoyed to work and clean. That's how she relieved stress in her life. She liked to go for long walks. She liked to walk the dogs. Those are things that she's telling a psychologist. We also have facts such as that a person has had her hand smashed so that she can obtain prescription drugs illegally for the people in the home. And we're not disputing those. She would go and do that because she was told or commanded to do that, didn't try to flee or get away. That doesn't suggest a person who's in her right mind, who's in control of her faculties and is willing or knows how to find help for an untenable situation. So when you say that, well, you know, she was all a happy household and all that. I'm not saying this was a very dysfunctional household. The question is whether that dysfunction was connected to forced labor. And that's where the evidence is wholly insufficient in this case. That that dysfunction, there clearly was dysfunction. There was drug abuse engaged in by Shannon Eckley as well. There was physical abuse on a number of occasions. But, again, we're talking about an 800-day span of time. This was a period of time that Jessica Hunt was working, going to work at Wendy's from May 2011 to the end of the facts of this case, going to work and working at a Wendy's restaurant. And yet the government has created this narrative that somehow this is a disabled woman being held captive against her will. Shannon Eckley's mom was, in essence, literally across the street as compared to Dumeshi's victim whose parents were literally across the ocean. So that's the real problem here, that this is a set of ugly facts that the government has tried to overlap the forced labor statute on. I see that I'm out of my time, and I'll come back and rebuttal. All right. Good morning, Your Honors. Good morning. Chelsea Rice, Assistant United States Attorney from the Northern District of Ohio. Your Honors, this Court should affirm the convictions of Jordi Hunt and Jessica Callahan as well as their below-guideline sentences in this case. This case is not about roommates or a living situation gone awry. As the evidence at trial demonstrated and the fact-finders determined after observing 34 witnesses from the government, including three days of examination of the adult victim, this was a situation of forced labor. Your Honor, there were a number of witnesses, including the adult victim, who testified that the labor she was forced to perform was directly tied with the abuse, humiliation, psychological coercion, and threats of having her daughter removed from her. When she didn't clean up after the numerous animals in the house, her face was shoved in the dog excrement. She was only permitted out of the basement when she was able to clean, and her and her three-year-old daughter only were able to eat after she had completed her chores. Your Honor, Mr. Bryan continues to go back and recite arguments that were made before the jury, cite two things that are not in the record, and the standard of this Court is to review the motion for a new trial and a de novo review. I have a question about the statute. So I understand your argument in response that, you know, well, the statute by its terms isn't restricted to international trafficking, even though that happens to be the fact pattern of many of these cases. But I was just looking at the statute. I guess it has no foreign or domestic commerce clause component at all. The person doesn't even have to have crossed state lines, right? Am I right about that? And is that because this is like Section 5 legislation for, or not, it wouldn't be Section 5, but 13th Amendment enforcement legislation? Is that what's going on? Or is it that, because I take it she didn't cross state lines. Am I right about that? That's correct, Your Honor. No, this is not across state lines. And so this statute, as the legislative history demonstrates, is rooted in the 13th Amendment to the Constitution. I see. So you just don't need to worry about that. There is no requirement of interstate commerce because it is created to abolish slavery in all forms. In fact, the legislative history points out that it was created and then amended in 2000 and again in 2008 to combat all forms of modern-day slavery. In fact, Congress specifically expanded the application of the Trafficking and Victims Protection Act to include more situations than those that the United States Supreme Court found in Kosminski. And after that amendment, it included more coercive forms of manipulation. In this case, there is abuse, confinement, isolation, psychological coercion, and the abuse of legal process. So, Your Honors, even under the former Kosminski standard, this case would have been more than sufficient. And there were several instances that Mr. Bryan spoke about that I wanted to touch on here. And I know in our briefs and our view of the record makes clear, but the timeline is important and the references to the cookouts and attempts to leave the house by Ms. Eckley, as this Court has pointed out and the Supreme Court has pointed out, are of no moment if the victim is placed in such fear that the victim feels they cannot leave. So there's no mention of the video of the child in the room by Mr. Bryan. And we have a child monitor and a camera. And she's being directed by presumably both defendants in this case to beat her child because the child's crying, I think. And this is some coercion, is it not? Is it some of the basis that this young woman was fearful? Absolutely was, Your Honor, yes. There were multiple videos made, and the first video was created after the adult victim attempted to escape and then was brought back and told by Jessica Hunt that if she stayed with her mother, her mother would report her to Children's Services. So absolutely that video was used as coercion. Those videos were shown to the jury. The jury was able to review them and consider them in their analysis and determination of the evidence. And the jury also heard from the adult victim as she watched those videos and explained them. So there's no question that those videos were used as coercion and manipulation. As a number of witnesses testified, when the adult victim was seen outside of the house going to buy cigarettes and beer for the defendants, she was always in a hurry. She was always alone. Her child was left back with the defendants, literally being held as a form of manipulation in order to induce her to come back. To Mr. Bryan's point that she worked every day at a Wendy's, presumably her child did not accompany her to Wendy's to work. Is that correct? Mr. Bryan was referring to Jessica Hunt. A portion of the time period she did work at Wendy's. At no time did the adult victim work outside of the home. No, Your Honor. And, in fact, the evidence at trial showed that when Jessica Hunt had to work at Wendy's, there were times that the adult victim had to wash her clothes for her. And during the time that she was at Wendy's, the adult victim and her child were locked in the basement if she was not being forced to clean. In the upstairs bedroom, where there was no ability for her to use the bathroom, that the four children of Jessica Hunt abused the adult victim and the juvenile, the three- to five-year-old child during that time period. As Judge Clay pointed out, this is not a benign record. The record makes very clear, as it did for the jury, the horrors that were endured by this victim. There is no doubt, based on these conditions of confinement, that the labor she performed was not done willingly. That the reason she did not leave when she, as Mr. Bryan claimed, had the opportunities, is because of the abuse and continued manipulation and coercion she had endured. How did the government establish the kidnap evidence for the enhancement that was applied? Your Honor, there were a number of ways that the government did that. First of all, through the testimony of the adult victim herself, regarding the times that she was locked in the basement and held in the basement. She specifically pointed out photographs in the basement. During my direct examination of her, corrected me on multiple occasions to highlight that exactly where in that basement she was forced to sleep, a small elevated area where there was no water, as there was in the rest of the basement. There was also the testimony of the cooperating witness, Mr. Brown, regarding her being locked in the upstairs bedroom. There was where the windows were bolted shut. There was the testimony of Mr. Redman, who worked for the cable company, who came over, completely unbiased, uninterested party, and saw the adult victim and her child in a room with a large iguana crawling over them. In fact, that caused him such alarm that he had to speak to his supervisor and say, I've never seen anything like this. There's something going on here that is not right. So, Your Honor, certainly there was no photographic evidence of her being locked in the basement, but the jury heard the testimony of the adult victim. Other witnesses saw photographs where there had been locks on doors and windows. With respect to the traumatic brain injury, there were a number of references that there was no evidence presented to the jury. Well, again, the jury not only heard from the adult victim for three days, and the record, while it certainly does not capture what the jury was able to observe in her demeanor, reflects her limited abilities in speech and understanding. In addition, the government's Exhibit 80 series contained a number of medical records of the adult victim that specifically referenced traumatic brain injury. So there's no question that the jury had sufficient information regarding her limitations and extreme vulnerabilities. Your Honor, Mr. Bryan referenced the DiGiumesse case, and these facts eerily parallel the situation there. Certainly, the adult victim was a U.S. citizen. She did not come from a foreign country, but she was not allowed to use the bathroom. She was not allowed to shower. She had to work long hours every day. She was hit, punched, hit if she did not work. And unlike DiGiumesse, this victim was physically restrained, confined to the basement, confined to the upstairs bedroom, and confined to the bedroom in the front apartment. In addition, in this case, we have the extremely strong manipulation and coercion of using her child, the one person in her life that was a constant, and her love for her daughter, to continue to hold over her head and threaten that her child would be removed from her, as happened when the adult victim finally escaped and told law enforcement what she had endured. I'd like to speak briefly. There was a reference by Mr. Bryan to the cross-examination of the cooperating witness, Mr. Brown. Your Honors, as this Court is aware, defense is entitled to the opportunity for an effective cross-examination, not the opportunity to ask anything and everything that they desire. In this case, there was more than ample opportunity to cross-examine Mr. Brown. In fact, as the appellant cited in their brief, they claim that Brown's story fell apart in cross-examination. The defense were able to ask Mr. Brown about his prior child endangerment conviction, his jail sentence resulting from that, the fact that the defendants testified and cooperated against him in that child endangerment case, the fact that he hoped to receive a lesser sentence as a result of his plea agreement, the fact that he admitted to his own drug abuse, that he was engaged in the drug trade with the defendant, Jordy Callahan, the nature of his past relationship with the adult victim, and, in fact, before there was an objection, there was even reference made to the fact that Mr. Brown was not charged with this substantive forced labor count. So, Your Honor, this was more than sufficient impeachment evidence for the jury to evaluate Mr. Brown's bias and motivations regarding his testimony. And should this Court determine... that was what the jury did not hear. Is that correct? The jury did not hear the fact that Mr. Brown was not charged with the substantive forced labor count. The jury did hear that he engaged in a plea agreement with the United States, that his plea agreement entitled him to some benefit for his testimony, that at the time of sentencing, if he cooperated and was truthful, the United States would ask the Court for a lesser sentence in exchange for his cooperation. There was also reference by Mr. Bryan to the kidnapping enhancement on the special verdict form. Your Honors, during the trial, both from the introductory remarks to the jury to the conclusion of the trial, the jury heard one standard for the burden of proof, and that was beyond a reasonable doubt. There was never mention of any other standard than beyond a reasonable doubt. None of the verdict forms, including the special verdict form, on themselves contained beyond a reasonable doubt. However, the judge repeatedly instructed, and in fact mere moments before turning to the kidnapping enhancements, and those requirements indicated again that beyond a reasonable doubt standard must be applied to all elements of the case. The fact that the jury understood this standard was highlighted by Mr. Bryan, and the fact that they acquitted on counts three and five. The jury certainly understood the high burden that was set for them, and found that the government had not met that burden with those counts. And also with respect to count one, there was a special verdict form asking, did the conspiracy apply to the forced labor or the theft of government benefits? And the jury found that it only applied to the forced labor. The jury also clearly knew that it did not have to check every box on the special verdict form because it chose not to select the aggravated sexual abuse special verdict enhancement. In the remaining bit of my time, this court obviously has the record before it and can read through and see the extreme humiliation and abuse that this woman endured. Again, there is no question that a person would, no doubt that no one would willingly live in this type of situation. No one would willingly live in a basement, in an upstairs bedroom with no access to a bathroom, a shower, having to eat out of cans, being beaten when she tries to get food for her child. The references to excursions and partying, as the record demonstrates and the jury evaluated, happened before she was in the basement. And the references to the swimming pool, that occurred when they couldn't leave the adult victim at home. As the jury heard from Mr. Callahan's own voice recordings, this woman is a snitch, don't let her go near the windows, don't let her out alone. The defendants had to take her to what they categorize as excursions in order to continue to monitor her, just as Jessica Hunt did when she took her to her doctor's appointments, to her meetings with her attorneys. And it's no wonder that the adult victim was not truthful when she's meeting with these attorneys and other social services people when her abuser is sitting right next to her and her child is back at the house with the other abuser. I think I will conclude by highlighting that, as Judge Sutton pointed out, this statute is based on the 13th Amendment. This is absolutely, forced labor is absolutely a federal crime, as this court pointed out in Toviavi. And the facts of this case are extremely different from those in Toviavi. Certainly some of the labor may have been the same, but the situation of servitude and abuse is much more egregious. And these are not children under the control of parents. These are not roommates. This is not a dysfunctional family. This is a situation, as the jury heard and evaluated the evidence and concluded, where Jessica Hunt and Jordi Callahan forced Shannon Eckley to work and perform services for them, obtained prescription drugs through use of deception, and held her in a condition of involuntary servitude for more than two years. For these reasons, Your Honor, we ask the court to affirm the convictions and the sentences of Jessica Hunt and Jordi Callahan. Thank you. Thank you. I want to address quickly Judge Watson's point as it related to the videos. Again, this was an 800-day span in which these individuals lived together from May of 2010 to October of 2012. There were three videos that were made. The first video was made on October 16, 2011, a year and a half into this period of time, including after the period of time that Ms. Eckley was supposedly held captive in a basement. So there wasn't any way that those videos could have been used to extort her into remaining there for that year and a half period beginning there. And as it related to whether or not these videos were contrived or created by the defendants, again, and I'll take credit for the cross-examination of D.J. Brown, it was clear from his own cross-examination that when he first conveyed that to law enforcement, he said that was an incident that came upon them without them knowing it was going to happen, that Jessica Hunt's sons came running in the room, said Shannon's beating her daughter, and they flicked on the monitor that was up in the room at the time and they witnessed it occurring. And he even admitted that Jessica Hunt wasn't even there when this beating began and that Jessica Hunt was being dropped off by the woman in the, quote, PT Cruiser, which was her aunt, Dixie Durr, who was bringing her back from an appointment. And she walked in on this as it was occurring. That was the first video. The second one was made on November 22, after D.J. Brown had assaulted Shannon Eckley and moved out of the home. The facts are very important in this case because the devil's in the details. But when the government is able to take a broad statute and throw all of these ugly facts on top of that and say, you know, you have to show force and you have to show labor, and I think you also have to show a nexus between the brutality and labor, it's not hard for the jury to return a verdict in their favor under those circumstances. But that's not, I believe, what the statute entailed. I think it's important to note the government's own words in rebuttal because they're up here saying now the evidence is proof positive that she was held in a basement and everything else. But even co-counsel Mr. Goetz said in rebuttal, in his rebuttal closing argument, and we got all kinds of things about windows were nailed shut, windows were screwed shut. I don't think there was ever any evidence about anybody saying there was only one window that was screwed or nailed shut. You'll see the pictures. There's holes all over the place, including the number of holes that could have been used to have held a hook, a nail, anything in which you could have tied a rope around to close or tie up the door. We don't know. I'm sorry. We don't know. The government lawyer is saying we don't know. We didn't get pictures. People weren't in there when it was happening taking photographs. But I will remind you is to look very closely at the jury instructions that tell you that it doesn't even matter if the doors were locked. It doesn't matter if the doors were tied. Don't be distracted by this whole issue of whether there was a padlock here or a padlock there or there wasn't. Look at the instructions very carefully the court gave you and apply it to the facts you have. And it didn't matter. It didn't matter all that because they had this theory because this woman was disabled that she didn't have the ability to do the things that normal people would do if they were really being treated this way. Go to your mother's home like she did on one occasion, did go to her mother's home, just a walking distance away, only to return again when admittedly she said in cross-examination because she wanted to be boyfriend-girlfriend with D.J. Brown again. Not because Jessica was threatening her that your mom is going to call human services on her. Her mom could have called human services on her any time. She didn't have to be living with her to call human services on her. So what the government did is they took all of these horribles of horribles. I would say relatively few considering an 800-day span and applied this federal statute on top of it to arrive at a conviction, one in which, and I will acknowledge the jury was very conscientious, to acquit them of other parts of their narrative that she had to stay there because they were stealing her benefits. The jury acquitted them. They were threatening other people. The jury acquitted them of that. But again, all they needed is that one overt act, that one overt act to convict. And I believe the evidence is wholly insufficient to show that there was a nexus against all this mistreatment, which there was admittedly, and forced labor in this case. And that's why it's not usual that you would waste most of your time in an oral argument on a Rule 29 argument. But I think this is one of those rare cases that applies, just like it applied in Tovi Avi as well. These are very fact-specific circumstances that have to be addressed. And when you do that, you find that there was overreach here, that this was a case that should have remained in the state system to prosecute them for abuse of this individual under state law, but not to bring a federal forced labor case against them. After all, the 13th Amendment does apply here because this was to eradicate slavery. And I believe that it's offensive. And involuntary servitude. Well, slavery, which is involuntary servitude, which I agree. But when you look at the whole record in this case, which we're required to do on a de novo review, can you really believe that the elements of this offense were established beyond a reasonable doubt? And I'm out of time. I didn't get a chance to address the Daniel Brown issue. But if you're going to bootstrap some of that sufficiency of evidence on Daniel Brown's testimony, we should have had the opportunity to show the full benefit that Daniel Brown received in return for his testimony so that we could have undermined it. And the sentencing issues are important as well, but I think they're very well briefed. So thank you very much. All right. Thank you very much. And the case is submitted.